**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Steven Angelo WARD, Defendant–
Appellant.**

No. 90–2279.

United States Court of Appeals,
Tenth Circuit.

April 22, 1992.

---

Atty., with him on the brief), for plaintiff-appellee.

Before McKAY, Chief Judge, LOGAN, Circuit Judge, and SAM, District Judge.*

LOGAN, Circuit Judge.

In *Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Supreme Court rejected a per se rule that would prohibit law enforcement officers from questioning bus passengers about criminal activity without reasonable suspicion. It held that a police encounter on a bus does not necessarily constitute a seizure within the meaning of the Fourth Amendment—does not lose its consensual nature—just because it takes place in the "cramped confines" of a bus. *Id.* 111 S.Ct. at 2389. The decision stated that the Fourth Amendment inquiry applies equally to police encounters on trains. *Id.* at 2388. The appeal before us tests the limits of *Bostick* in an encounter in a small private compartment of a train when, unlike *Bostick*, there was no advice that the one questioned had the right to refuse consent and there were no others in the vicinity who might witness the interrogation.

Defendant Steven Angelo Ward entered a conditional plea of guilty to a charge of possession with intent to distribute less than fifty kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D). On appeal, he challenges the district court's denial of his motion to suppress the marijuana found in his luggage and statements he made to law enforcement officers.

I

Acting upon information provided by a previously reliable source regarding an Amtrak train passenger boarding at Flagstaff, Arizona, Albuquerque Police Department Detective Q. James Erekson (the detective) and Drug Enforcement Administration Agent Kevin Small (the agent) met the train carrying the identified passenger designation.

Peter Schoenburg, Asst. Federal Public Defender, Albuquerque, N.M. (Tova Indritz, Federal Public Defender, with him on the briefs), for defendant-appellant.

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Stephen R. Kotz, Asst. U.S.

* The Honorable David Sam, United States District Judge for the District of Utah, sitting by

when it arrived in Albuquerque just after 1:00 p.m. The officers sought out the conductor, who took them to defendant who was occupying a small roomette on the lower level of one of the train's sleeper cars. The conductor knocked on the door, and when defendant opened the curtain, the conductor said, "There's some gentlemen here that would like to see you." IV R. 13. The conductor then departed, and the detective commenced the questioning that led to the answers and discoveries that resulted in the instant appeal.

At this point the officers had only the following information: The informant had told police that a Mr. Leon had paid $600 in cash, which he pulled out of his boot, for a one-way ticket from Flagstaff to Kansas City, Missouri. Mr. Leon reportedly had given a telephone number with a Tucson prefix at the time he had made the reservation. The reservation was for the largest private room on the train, which accommodated up to six people and was known as a family room. Mr. Leon had said that his family could not accompany him on the trip but he would use the room himself. When the officers had contacted the train conductor, asking him if he had seen anyone out of the ordinary, the train conductor told the officers that a Mr. Leon had moved from a large family room to a small roomette.[1]

 Although Tuscon was known as a drug origination point and Flagstaff a connecting point, the information the officers

had on Mr. Leon at this point, when the questioning began, was consistent with innocent travel. This court has summarized the various types of police-citizen encounters into three general categories: (1) voluntary encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative detentions, which are seizures within the meaning of the Fourth Amendment and must be supported by reasonable suspicion; and (3) arrests, which are even more intrusive and must be supported by probable cause. *United States v. Evans,* 937 F.2d 1534, 1537 (10th Cir.1991) (quoting *United States v. Cooper,* 733 F.2d 1360, 1363 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984)). A seizure is constitutional only if supported "by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). The totality of the circumstances "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The district court in the instant case made no finding that reasonable suspicion existed at this time.[2] We are satisfied that no court could have found "reasonable suspicion" for an investigative detention at this point.[3]

At the detective's request, during questioning in defendant's roomette, defendant

1. The detective testified that the conductor himself suggested the move, apparently for his own purposes. *See* IV R. 12.

2. With respect to when reasonable suspicion existed, the district court's only finding was that later when the officers

asked the [d]efendant to observe the American Tourister luggage and to show them the contents of his pockets, at that point, they had reasonable suspicion based on articulable facts to detain the [d]efendant for an additional brief period of time for the purpose of inquiring into his ownership of the American Tourister luggage and whether he had any keys to that luggage.

IV R. 101.

3. The courts are split on the standard of review of a district court's finding of reasonable suspicion. Some review de novo, *see, e.g., United States v. Uribe-Velasco,* 930 F.2d 1029, 1032 (2d

Cir.1991); *United States v. Mondello,* 927 F.2d 1463, 1470 (9th Cir.1991), and others for clear error, *see, e.g., United States v. Peoples,* 925 F.2d 1082, 1085 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991); *United States v. Rose,* 889 F.2d 1490, 1496 (6th Cir. 1989). We have applied the clearly erroneous standard. *See, e.g., United States v. Walker,* 941 F.2d 1086, 1090 (10th Cir.1991). The distinction between the two standards seems unimportant when the facts are undisputed, there are no credibility questions, or the question is only whether the facts as found by the district court meet the constitutional requirements set out in the Supreme Court cases. Because we would reject any finding that reasonable suspicion existed on the facts set out above, assumed to be true, we do not remand for findings by the district court.

stated that his only luggage was a shoulder bag he allowed the detective to examine. In response to another request defendant produced an Arizona driver's license with the name and picture of Steven Angelo Ward. When the detective asked about the difference in names, defendant said that his real name was Ward and that "Leon" was the name of a friend. Although defendant testified that he explained that his friend made the train reservation, the detective testified that defendant gave no other explanation for why he was traveling under an assumed name and that this aroused his suspicion.

During this questioning agent Small left the train and learned that the callback number left when defendant made the Amtrak reservation traced to a person named Ward. The agent also ascertained from a train attendant that defendant had boarded with two tan American Tourister luggage bags. When considered along with the information elicited by the detective's questioning, and only then, these two new items would establish reasonable suspicion for an investigative detention of defendant for further questioning. Thus, if the questioning of defendant in his roomette can be upheld as a voluntary, consensual encounter, we have no difficulty in upholding the district court's order denying suppression of the marijuana later discovered in defendant's American Tourister luggage and admitting defendant's statements to the officers. Thus, we must now consider the questioning of defendant on the train under the standards of *Bostick* and other decisions for a consensual encounter.

## II

██ When a person is seated on a bus or train and has no desire to leave, the *Bostick* Court said the "free to leave" analysis is inapplicable. 111 S.Ct. at 2387. "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Michigan v. Chesternut,* 486 U.S.

567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

██ "The cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary." *Id.* 111 S.Ct. at 2389. The Supreme Court specifically mentioned that this analysis applies equally to encounters on trains. *See id.* at 2388.

The roomette occupied by defendant at the time of the police encounter in the instant case was the smallest private compartment on the train. The entire compartment was only six feet, nine inches in length. Inside there were two seats that face each other, which were less than two feet apart; two good-sized people sitting on the seats would bump knees unless they angled them sideways. The doorway to the roomette was just one foot, eleven inches wide; only one person could pass through it at a time. The aisle outside the doorway also was narrow; the only way for two people to pass in the aisle was for both to turn sideways.

When defendant opened the door pursuant to the conductor's knock, the detective leaned inside, identified himself as a police officer, and both officers displayed their badges. Agent Small was behind the detective in the aisle and did not enter the roomette; however, it is clear that defendant saw at least two officers outside his roomette. The detective asked defendant if he could speak with him; defendant said "yes." The detective asked, "Do you mind if I come in?"; defendant said "no." The detective entered the roomette and at some point sat down while keeping his knees between defendant and the door to the roomette. The door remained open at all times. Although the detective had a weapon with him throughout the encounter, it was inside a zipped fanny pack from which it was not removed. At this point, the detective began interrogating defendant. The detective asked the questions regarding defendant's identification and luggage, as well as other questions about his itinerary and ticket.

■ Defendant testified that throughout the encounter he never felt free to leave because there was always an officer within a few feet of him. Although defendant acknowledged that he had prior contact with police officers,[4] and that he "guess[ed]" that he knew that under certain circumstances he did not have to talk to police officers, he testified that he did not know that he did not have to talk to the detective. IV R. 79. Although defendant acknowledged that he was not the only person traveling in the sleeper car, he indicated that other than the officers no people were around. In contrast, the agent testified that during the encounter people were walking by in the hall. The agent acknowledged that the only traffic would have been from four rooms, and although his recollection was that they all were occupied, it appears that one of the four rooms was that vacated by defendant. In any event it is undisputed that while being questioned in the roomette defendant was alone except for the officers. The setting of the encounter in this case, inside and within the immediate vicinity of a small private roomette on a train, although not dispositive by itself, supports a determination that a reasonable person in defendant's situation would have felt unable to decline the officers' requests or terminate the encounter.

An important distinction from the other leading cases, we believe, is that defendant was *not* in an open public place where he was within the view of persons other than law enforcement officers. *Cf. Bostick,* 111 S.Ct. at 2384 (on bus with other passengers); *Chesternut,* 486 U.S. at 569, 108 S.Ct. at 1977 (on street); *Florida v. Rodriguez,* 469 U.S. 1, 4, 105 S.Ct. 308, 309–10, 83 L.Ed.2d 165 (1984) (per curiam) ("in the public area of the airport"); *INS v. Delgado,* 466 U.S. 210, 217 n. 5, 104 S.Ct. 1758, 1763 n. 5, 80 L.Ed.2d 247 (1984) (in factory with other people in the area); *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (on public airport concourse). The Supreme Court at times expressly has recog-

nized the importance of an encounter's occurrence in a public place. *See Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984) (holding *Miranda* warnings need not be given motorists during an ordinary traffic stop; circumstances supporting this conclusion include, "[p]erhaps most importantly, [that] the typical traffic stop is public, at least to some degree," there are witnesses, and the "exposure to public view" reduces a person's fear of abuse if he or she does not cooperate); *Delgado,* 466 U.S. at 224, 104 S.Ct. at 1767 (Powell, J., concurring in the result) ("the systematic and public nature of the [factory] survey serve[d] to minimize any concern or fright on the part of lawful employees"); *Mendenhall,* 446 U.S. at 563, 100 S.Ct. at 1882 (Powell, J., concurring in part and concurring in the judgment) (in public area of the airport a citizen was near other people "from whom she could have sought aid had she been accosted by strangers"). Indeed, a plurality of the Court has described a voluntary encounter in terms of officers "approaching an individual *on the street or in another public place." Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (emphasis added); *see also Bostick,* 111 S.Ct. at 2384 (officers can "approach individuals at random in airport lobbies *and other public places"* (emphasis added)); *id.* at 2388 (test "applies equally to police encounters that take place on trains, planes, and city streets"); *id.* at 2389 (test applies to encounters on a bus). We believe that these cases make clear that whether an encounter occurs in the public view is particularly significant. Common sense compels the same conclusion.

In addition to the physical circumstances of the roomette and the fact that defendant was alone when confronted in a nonpublic place, the setting of this encounter would appear to be significant in another sense. In this Fourth Amendment inquiry, it is relevant that an individual traveling in a private train roomette has a higher expec-

---

**4.** Defendant had two arrests, in 1976 and 1979. The presentence report indicates no record of a conviction on the first arrest and is unclear whether defendant was convicted on the second. II R. 5.

tation of privacy than an individual traveling in a public passenger car of the train. *See United States v. Liberto*, 660 F.Supp. 889, 891 (D.D.C.1987), *aff'd without opinion*, 838 F.2d 571 (D.C.Cir.1988); *see also United States v. Tartaglia*, 864 F.2d 837, 841 (D.C.Cir.1989) (applying *Liberto*). We believe that the officers' confrontation of defendant in a place where he had a legitimate expectation of privacy supports the conclusion that the encounter occurred in a private, nonpublic setting—as distinguished from an open, public setting.

 Furthermore, we believe that a reasonable innocent person who is alone when approached by law enforcement officers is more likely to feel that he or she was the specific object of the officers' inquiry. This feeling would be heightened when the officers make not just general inquiries, but ask focused, potentially incriminating questions. In contrast, in a public setting, particularly where a questioned person can see that other persons also are being questioned, the reasonable innocent person is less likely to feel singled out as the officers' specific target—and less likely to feel unable to decline the officers' requests and terminate the encounter. *Cf. United States v. Gonzales*, 842 F.2d 748, 751 (5th Cir.1988) ("statements by police that intimate that an investigation has focused on a particular individual" tend to suggest that a seizure has occurred), *overruled on other grounds by United States v. Hurtado*, 905 F.2d 74 (5th Cir.1990) (en banc).

For the foregoing reasons, the setting of the instant encounter is distinguishable from that in cases arising from encounters in the public coach passenger car area of trains, *see, e.g., United States v. Thompson*, 941 F.2d 66 (2d Cir.1991); *United States v. Carrasquillo*, 877 F.2d 73 (D.C.Cir.1989), in the public passenger seating area of buses, *see, e.g., Bostick*, 111 S.Ct. at 2382; *United States v. Madison*, 936 F.2d 90 (2d Cir.1991); *United States v. Lewis*, 921 F.2d 1294 (D.C.Cir.1990), and in the public area of transportation terminals, *see, e.g., United States v. Springer*, 946 F.2d 1012 (2d Cir.1991) (taxi stand at bus terminal); *United States v. Williams*, 945 F.2d 192 (7th Cir.1991) (train station).[5]

---

5. We recognize that in some pre-*Bostick* cases the District of Columbia Circuit held that encounters in the setting of a train roomette did not amount to seizures for purposes of the Fourth Amendment. *See United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C.Cir.1990) (2–1 decision) ("Nor does the mere presence of officers in the doorway of a train roomette (and the adjacent aisle) defeat the 'free to leave' test."); *United States v. Brady*, 842 F.2d 1313, 1315 n. 5 (D.C.Cir.1988) (no merit in contention "that the narrowness and confinement of a train compartment are inherently isolationist, hence coercive"). *But see Tavolacci*, 895 F.2d at 1430–31 (Edwards, J., dissenting) (with police officers blocking doorway to train roomette no reasonable person would feel free to leave). However, in other cases the District of Columbia Circuit found that train roomette encounters were seizures. *See United States v. Savage*, 889 F.2d 1113, 1116–18 (D.C.Cir.1989) (although presence of officers in doorway of train compartment and adjacent aisle did not by itself create a seizure the encounter became a seizure when the officer's questioning became "direct and probably forceful"); *United States v. Battista*, 876 F.2d 201, 204–05 (D.C.Cir.1989) (encounter in train roomette, where two officers in plain clothes without visible weapons displayed badges and awakened a citizen, "surely became" a seizure when citizen's driver's license was not returned); *see also United States v. Levetan*, 729 F.Supp. 891 (D.D.C.1990) (holding encounter was a seizure when the setting was a "cramped, confined" train roomette; the doorway was blocked; there were two officers in plain clothes without visible weapons; the officers did not raise their voices; it was not clear whether the citizen's train ticket was returned; officers said they had searched other passengers; defendant overheard someone discuss delaying the train's departure; and the citizen was not initially advised he could decline to talk to the officers or refuse to consent to any search).

Although we recognize that the facts of each case are unique, for the reasons stated in this opinion we believe that, like *Battista*, *Savage*, and *Levetan*, and urged by the dissent in *Tavolacci*, the encounter in the train roomette was a seizure. Additionally, we believe the *Tavolacci* and *Brady* panels did not adequately consider the coercive influence of the fact that an individual blocked in a small train roomette by police officers is alone, not in a public place, and cut off from other people. This failure also is demonstrated in *Savage*, where although ultimately holding the encounter was a seizure, the court cited *Delgado*, 466 U.S. at 219, 104 S.Ct. at 1764, to support the statement that officers blocking the roomette doorway and aisle "did not ... prevent a reasonable person in [defendant's] position from declining to talk with the police or from leaving the compartment." *Savage*, 889 F.2d at 1117. It is obvious that the

In *Bostick* the Supreme Court mentioned as a factor particularly worth noting that "the police specifically advised Bostick that he had the right to refuse consent." *Bostick*, 111 S.Ct. at 2385; *see also id.* at 2388. In the case before us, both the detective and the agent acknowledged that they never advised defendant at any time that he had the right to terminate the encounter or to refuse consent.

Under the totality of the circumstances test, of course, this one factor by itself does not determine whether a seizure has occurred. *See United States v. Lloyd*, 868 F.2d 447, 451 (D.C.Cir.1989) (An encounter "does not become a 'seizure' *merely* because the officer does not tell the person that he [or she] may refuse to answer the questions and is free to leave." (emphasis added)). In at least one case besides *Bostick*, however, the Supreme Court emphasized the importance of whether an individual was advised of his or her rights. *See Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879 (fact that defendant expressly was told she could decline to consent was "especially significant"); *see also In re J.M.*, 596 A.2d 961, 969 (D.C.1991) (whether defendant was informed of right to refuse consent was "very significant"). Whether an individual is advised of his or her rights is important, particularly because warnings of Fourth Amendment rights "show the individual that the police 'are prepared to recognize' his choice to assert his constitutional rights." 3 Wayne R. LaFave, *Search and Seizure* § 8.2(i), at 214 (2d ed. 1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 468, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966)). In all of the cases cited above, whether the defendant was advised of his or her rights was important even though the encounter occurred in a public place. In the instant encounter, which occurred in the roomette, we believe that the officers' failure to advise defendant of his right to terminate the encounter should be given even greater weight.

The officers did not touch or physically restrain defendant; they were in plain clothes; their weapons were not displayed, although as in *Bostick* they were kept in a pouch visible to defendant;[6] and the officers used a regular tone of voice. All these factors we regard as neutral or favoring a consensual encounter. Other facts, however, support the conclusion that defendant was seized. Defendant immediately knew that he was outnumbered by at least two officers; the presence of more than one officer increases the coerciveness of an encounter. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Defendant testified that the officers' questions were "real blunt" and "real direct." III R. 12; *cf. United States v. Savage*, 889 F.2d 1113, 1115, 1117 (D.C.Cir.1989) (encounter in train roomette became seizure when officers' questions became "direct and probably forceful"). Defendant is five feet, seven inches tall and weighs 145 pounds; he had recently undergone a kidney transplant for which he was still taking medication. Defendant's slight physique and health problems would tend to suggest that defendant was more easily intimidated than some other persons; the personal traits of an individual are relevant to the issue of coercion. *See United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir.1985) (defendant's upbringing in Argentina, which instilled an acquiescence to police authority, is relevant to whether a person would feel unable to terminate the encounter).

---

*Savage* court overlooked the fact that in *Delgado* the factory workers were in the presence of other workers, 466 U.S. at 217 n. 5, 104 S.Ct. at 1763 n. 5, were free to move around in the factory, *id.* at 218, 104 S.Ct. at 1763–64, and apparently in some cases even were free to leave the factory without being questioned. *Id.* at 219 & n. 7, 104 S.Ct. at 1764 & n. 7. In *Delgado,* these facts led the Supreme Court to apply to the factory encounters "the same considerations attending contacts between the police and citizens *in public places*." *Id.* at 217 n.

5, 104 S.Ct. at 1763 n. 5 (emphasis added). To the extent that the District of Columbia Circuit's analysis fails to adequately consider the non-public setting of an encounter in a train roomette, we reject it.

**6.** We agree with the Sixth Circuit that a reasonable person " 'would not believe that a police officer is not armed.' " *See United States v. Grant*, 920 F.2d 376, 382 (6th Cir.1990) (quoting *United States v. Fields*, 733 F.Supp. 4, 7 (D.D.C. 1990), *vacated,* 946 F.2d 1567 (D.C.Cir.1991)).

We agree with *United States v. McKines*, 933 F.2d 1412, 1424–26 (8th Cir.) (en banc), *cert. denied*, — U.S. —, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991), that Supreme Court cases compel the conclusion that the ultimate issue of whether a seizure occurred is a question of law. *See also Bostick*, 111 S.Ct. at 2392 (Marshall, J., dissenting); *United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991); *United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir. 1990). *But see United States v. Valdiosera–Godinez*, 932 F.2d 1093, 1098 n. 1 (5th Cir.1991); *United States v. Rose*, 889 F.2d 1490, 1495 (6th Cir.1989); *United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989). Based on the totality of the circumstances, we hold that defendant was seized for purposes of the Fourth Amendment during the initial encounter in the train roomette, specifically at the time when, without informing defendant of his right to terminate the encounter, the detective first began to ask defendant potentially incriminating questions.

## III

■ The detective searched defendant's roomette, his shoulder bag, and his boots without finding anything incriminating during the initial encounter that we have found to be an unlawful seizure. After the officers acquired the information about the two tan bags, they decided to seek any keys defendant had. It was the luggage key defendant produced pursuant to the agent's request that led to the marijuana in the luggage defendant seeks to have suppressed. We hold that this discovery is tainted and the fruit of the Fourth Amendment violation.

■ "Evidence seized in a search conducted during an illegal detention must be suppressed unless there is sufficient attenuation between the detention and the consent to search." *United States v. Turner*, 928 F.2d 956, 958 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991). "This [c]ircuit has held that when a consent to search is preceded by a Fourth Amendment violation, the consent is valid only if it is voluntary in fact." *United States v. Guzman*, 864 F.2d 1512, 1520 (10th Cir.1988). The relevant factors for determining attenuation emphasized in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), are: (1) the closeness in time between the Fourth Amendment violation and the alleged voluntary act; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 S.Ct. at 2262.[7]

■ Here, defendant's consent to the first search of his pockets occurred only minutes after the illegal seizure began. Immediately before the consent, under the officers' sequence of events, defendant was left alone only briefly in his roomette while the detective conferred with the agent in the aisle before the agent asked defendant if he had any keys. Although the detective refused to say that defendant was alone for only thirty seconds, he did say that it was for "a short period of time." IV R. 50. In addition, we note that while defendant was alone in the roomette the two officers were conferring just five or six steps away. Based on the brief period of time involved and the close proximity of the officers to defendant, we conclude that there were no intervening circumstances that would separate the seizure from the consent to search that produced the first luggage key. The new information the agent acquired during his absence would not support a reasonable suspicion finding in the absence of the information acquired by the detective during

---

7. Because the district court found that the encounter was consensual from the outset, and thus not a seizure, the district court did not address the taint issue. Although this court's function is not to try factual issues, and the "voluntary in fact" determination normally is one for the district court, we hold that a remand to address this issue is unnecessary. We may conduct a taint analysis "where the proceedings below 'resulted in a record of amply sufficient detail and depth from which the determination may be made.'" *United States v. Maez*, 872 F.2d 1444, 1454 n. 13 (10th Cir.1989) (quoting *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975)). The record in this case is sufficiently developed for us to decide the issue.

the questioning we have held was unlawful. Also, the purpose of the officers' actions when they initially seized defendant and when they asked if he had any keys was the same—to acquire evidence to confirm their suspicions that defendant was carrying drugs. Thus, we hold that defendant's consent to the first search of his pockets, which produced the first luggage key, was tainted by the prior illegality. Because the subsequent chain of events ultimately led to the forty-one pounds of marijuana,[8] the marijuana was the fruit of the illegal seizure and should have been suppressed—unless defendant legally abandoned his right to object to the search of the suitcases.

## IV

Now we address whether the illegal seizure also tainted defendant's statements disclaiming ownership of the suitcases. It is undisputed that defendant came out of the roomette, viewed the luggage, and then denied that the two tan suitcases were his. Thereafter, the detective told defendant that the luggage would be detained. Defendant again disclaimed ownership of the two suitcases. Defendant was given a receipt for the suitcases and was allowed to leave with the train when it departed from the train station on time. After the officers seized the luggage, three drug dogs alerted to the suitcases. The officers obtained a search warrant, searched the suitcases, and discovered inside them forty-one pounds of marijuana.

 We need not address the general question of whether a statement disclaiming ownership should be considered an abandonment of any privacy interest, because under the circumstances of this case any abandonment was ineffective because it was tainted by the prior illegality. "[A]bandonment will not be recognized

when it is the result of illegal police conduct." *United States v. Brady,* 842 F.2d 1313, 1315 n. 7 (D.C.Cir.1988); *see also United States v. Lucci,* 758 F.2d 153, 155 (6th Cir.) (disclaimer prompted by an unconstitutional seizure or arrest does not preclude exclusion), *cert. denied,* 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985); *United States v. Tolbert,* 692 F.2d 1041, 1045 (6th Cir.1982) ("[A]n unconstitutional seizure or arrest which prompts a disclaimer of property vitiates that act."); *United States v. Gilman,* 684 F.2d 616, 620 (9th Cir.1982) (unlawful police conduct cannot cause a loss of standing to challenge a search); *United States v. Morin,* 665 F.2d 765, 770 (5th Cir.1982); *Floyd v. United States,* 677 F.Supp. 1083, 1091 (D.Colo. 1987), *rev'd on other grounds,* 860 F.2d 999 (10th Cir.1988). These cases suggest that when an alleged abandonment follows a Fourth Amendment violation the issue is whether the abandonment of property was voluntary. *See, e.g., Morin,* 665 F.2d at 770 ("Abandonment, like consent, must be freely given in order to be effective.").

 We believe that the appropriate analysis of this issue is the same as that of the voluntariness of a consent to search that was preceded by a Fourth Amendment violation. *Cf. United States v. Guzman,* 864 F.2d 1512, 1520 (10th Cir.1988). Thus, when an alleged abandonment is preceded by a Fourth Amendment violation, the abandonment is valid only if, based on the totality of the circumstances, the abandonment is voluntary in fact, while giving sufficient weight to the three factors emphasized in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

 Applying this test, we conclude that the government cannot establish sufficient separation between defendant's illegal seizure and his statements disclaiming ownership of the suitcases. Defendant

---

**8.** Because the first luggage key fit the locks on the tan American Tourister suitcases outside the roomette, it confirmed the reported, albeit denied, link between defendant and the suitcases. Thereafter, the officers asked defendant if he had any more keys, and he produced three more, which further tied defendant to the suitcases. Based on the information known at this

point, the district court found the officers then had reasonable suspicion to seize the luggage, which they did. This led to the canine alerts to the luggage, which clearly provided probable cause for the search of the suitcases. Obviously, this search led to the discovery of the marijuana.

first disclaimed ownership of the suitcases after he came out into the aisle when the agent requested that he view the luggage. This occurred only moments before (under defendant's sequence of events), or after (under the officers' chronology) defendant produced the first luggage key—an act we have determined was tainted by the prior illegality. A few moments later, when the detective told him that the luggage would be detained, defendant again disclaimed ownership. There were no intervening circumstances that would break the nexus between the illegal questioning of defendant and the disclaimers. Thus, defendant's disclaimers were tainted by the illegality, and the district court's conclusion that defendant legally had abandoned the suitcases is clearly erroneous.

We REVERSE the denial of defendant's motion to suppress the marijuana found in defendant's luggage and the statements he made to law enforcement officers during the encounter on the train that we have held to be unlawful. We REMAND for further proceedings consistent herewith.