978 F.2d 1268
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony Lynn AVERITTE, Defendant-Appellant.
 No. 91-2276.
 United States Court of Appeals, Tenth Circuit.
 Nov. 5, 1992.
 
 Before SEYMOUR, LAY* and JOHN P. MOORE, Circuit Judges.
 ORDER AND JUDGMENT**
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Anthony Lynn Averitte appeals his conviction on one count of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). He advances three theories for reversal of his conviction: (a) the district court erred in denying his motion to suppress evidence allegedly seized in violation of his Fourth Amendment rights; (b) the district court erred in refusing to allow him to present hearsay evidence; and (c) the evidence does not support a verdict of guilt beyond a reasonable doubt. We affirm.
 
 I.
 
 2
 On December 11, 1990, at the Albuquerque train station, Police Detectives Erekson and Sheridan and DEA Agent Small were looking for drug couriers on the inbound Amtrak train from Los Angeles. Based on a tip from an Amtrak employee, Detectives Erekson and Sheridan approached defendant and his travel companion on the train platform, identified themselves as police officers, and asked to see their tickets. The agents discovered the tickets had been purchased with cash the day before travel. Defendant and his companion denied having identification. Detective Sheridan then informed the two men that Los Angeles was considered a "source city" for transportation of narcotics. The agents asked for and received consent to search their luggage but chose not to conduct a search at that time.
 
 
 3
 After boarding the train and learning from a passenger that defendant had moved his bag, Agent Small asked defendant to "hang on a second" while he conferred with Detective Erekson. The agents then asked defendant if he had luggage elsewhere on the train. Defendant indicated he had a bag in the lounge car and gave the agents permission to search it. No narcotics were found, and the agents left the train.
 
 
 4
 The agents reboarded when they learned that a passenger who happened to be a private investigator found socks containing cocaine in the lounge car restroom. After using the restroom, the private investigator observed defendant carry his bag into the restroom, exit less than one minute later, leave his bag in the lounge car while he went upstairs, and then allow the agents to search the bag. Thinking defendant's behavior odd, the private investigator went into the restroom, looked in the trash bin, and saw a pair of socks lying on top of the paper towels he had discarded. He unrolled the socks, found what appeared to be cocaine, replaced the socks, and told the lounge car bartender to notify the agents.
 
 
 5
 Agent Small recovered the socks and spoke with the lounge car bartender, who substantiated the private investigator's observations. Detective Erekson then talked to the private investigator and confirmed his willingness to testify at trial. About that time, defendant returned to the lounge car. Agent Small stood in the aisle engaging defendant in conversation, ostensibly blocking his view so he couldn't see Detective Erekson talking with the private investigator.
 
 
 6
 Hoping to find socks matching those found in the restroom, Agent Small identified himself as a DEA agent and asked defendant if he would voluntarily consent to a second search of his bag. Defendant responded, "Sure, go ahead. I've got nothing to hide," and handed Agent Small the bag. Agent Small found socks "exactly matching" those taken from the trash bin, white with blue toes and heels. Defendant was advised of his Miranda rights, arrested, and removed from the train.
 
 
 7
 After the train departed, Detective Erekson contacted Amtrak officials and requested train personnel thoroughly search the lounge car restroom. Three more pairs of socks containing cocaine were found.
 
 II.
 
 8
 Defendant contends that the matching socks found in the second search of his bag should have been suppressed because he was unlawfully detained three times by the agents. First, he asserts Detectives Erekson and Sheridan had no constitutionally justifiable basis for initially questioning him on the train platform. Alternately, defendant argues that if the train platform encounter did not implicate the Fourth Amendment, Agent Small's instruction to "hang on" after learning defendant moved his bag amounted to an investigative detention. Moreover, defendant maintains he was illegally stopped a third time in the lounge car when Agent Small blocked the aisle while engaging him in conversation. Defendant claims his consent to search was tainted by these unlawful detentions and the fruit of the search, the matching socks, poisoned.
 
 
 9
 It is well established that not all encounters between police and citizens involve seizures of persons. Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). Indeed, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, --- U.S. ----, 111 S.Ct. 2382, 2386 (1991). Thus, even when law enforcement officers have no basis for suspecting a particular individual of criminal activity, they may question the person, ask to see identification, and request consent to search luggage as long as they do not convey a message that compliance is required. Id. (citations omitted).[1]
 
 
 10
 The inquiry is whether a show of authority is such that "a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n. 16. A police-citizen encounter thus does not trigger Fourth Amendment scrutiny unless it loses its consensual nature.
 
 
 11
 Here, defendant does not suggest that the agents used physical force to compel his consent to search. Nor has defendant presented any evidence of coercion. The agents did not create a "threatening presence," display weapons, physically touch defendant, or use "language or tone of voice indicating that compliance ... might be compelled." Mendenhall, 446 U.S. at 554. To the contrary, each encounter involved "voluntary cooperation" by defendant in response to "non-coercive questioning" by the agents. United States v. Morin, 949 F.2d 297, 300 (10th Cir.1991). Defendant readily responded to the agents' questions and gave unequivocal consent to search his bag. At no time did he hesitate or in any other way indicate that he was unwilling to talk with the agents or allow them to conduct a search.
 
 
 12
 Defendant's contention that his consent nonetheless was invalid because he was not asked to consent in writing or informed of his right to refuse consent is unpersuasive. "Under the totality of the circumstances test, of course, this one factor by itself does not determine whether a seizure has occurred." United States v. Ward, 961 F.2d 1526, 1533 (10th Cir.1992) (citation omitted). Indeed, an encounter "does not become a 'seizure' merely because the officer does not tell the person that he ... may refuse to answer the questions and is free to leave." Id. (quoting United States v. Lloyd, 868 F.2d 447, 451 (D.C.Cir.1989)).
 
 
 13
 The trial judge found each of defendant's encounters with the agents entirely consensual and his consent to search voluntary. Because those findings are not clearly erroneous and defendant has presented no evidence on appeal to support a determination of coercion or physical force, we conclude the trial judge properly denied the motion to suppress.[2]
 
 III.
 
 14
 At trial, defendant attempted to shift the blame for cocaine possession to his travel companion by introducing hearsay statements which his companion allegedly made before the two men were approached by the agents.[3] The trial judge refused to admit the hearsay statements on the ground that they did not tend to subject defendant's companion to criminal liability. The judge did, however, permit defendant to present evidence about his companion's clothing, including expert testimony that such dress identified the man as a gang member. More importantly, the judge allowed defendant to testify that his companion was in all likelihood a gang member and former prison inmate, and that his companion's background enabled him to identify the plainclothes agents before their approach. Defendant also testified that he and his companion met for the first time at the boarding station in Los Angeles.
 
 
 15
 On appeal, defendant argues his companion's hearsay statements should have been admitted under one of three hearsay exceptions: (a) Fed.R.Evid. 804(b)(3), as statements against penal or pecuniary interest; (b) Fed.R.Evid. 804(b)(4), as statements of personal or family history; or (c) Fed.R.Evid. 804(b)(5), as having "equivalent circumstantial guarantees of trustworthiness." Defendant claims the trial court's refusal to admit this evidence served to deprive him of a fair trial because the statements supported his theory of defense that his companion was the likely drug courier.
 
 
 16
 Defendant's evidentiary claims are without merit because the statements fail to satisfy the narrow definitional requirements of the Rule 804(b) hearsay exceptions. First, the statements are inadmissible under Fed.R.Evid. 804(b)(3),[4] because the connection between ex-felon or gang-member status and penal or pecuniary interests is tenuous at best. Similarly, the statements are not "declarations of pedigree"[5] within the scope of Fed.R.Evid. 804(b)(4).[6] Finally, admitting the statements would not further "the general purposes" of the Federal Rules of Evidence and "the interests of justice" because defendant was allowed to introduce the contents of the statements at trial. Fed.R.Evid. 804(b)(5)(C).[7]
 
 
 17
 "Whether a statement is in fact against interest must be determined from the circumstances of each case." Fed.R.Evid. 804 advisory committee's note. In reviewing a trial court's hearsay rulings, the need for deference "is particularly great because the determination of whether certain evidence is hearsay rests heavily upon the facts of a particular case." United States v. Rodriguez-Pando, 841 F.2d 1014, 1018 (10th Cir.1988). The trial judge did not clearly abuse his discretion by refusing to admit the statements.
 
 IV.
 
 18
 Defendant contends the evidence used to convict him was constitutionally insufficient to support his conviction beyond a reasonable doubt. Specifically, he claims the socks containing cocaine seized after his arrest were inadmissible for lack of foundation because of two gaps in the chain of custody.[8] First, defendant claims the government failed to present evidence about the bartender's possession of the socks, whomever else might have handled the socks, or whether the socks were tampered with before the train arrived in La Junta. More generally, defendant suggests the government offered no evidence about the custody of the socks from the time they were found until they were delivered to Agent Small in Albuquerque.
 
 
 19
 This court has long recognized the broad discretion afforded trial court judges in ruling on the admissibility of evidence containing chain of custody deficiencies. A chain of custody "need not be perfect for the evidence to be admissible." United States v. Cardenas, 864 F.2d 1528, 1531 (10th Cir.) (citations omitted), cert. denied, 491 U.S. 909 (1989). "If, upon considering the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with it, the trial judge deems the article to be in substantially the same condition as when the crime was committed, he may admit it into evidence." United States v. Wood, 695 F.2d 459, 462 (10th Cir.1982).
 
 
 20
 At trial, Agent Small, La Junta police officers, and the DEA chemist who tested the cocaine identified the sock and cocaine exhibits by appearance and peculiarities, as well as their signatures on the evidence tags. In addition, testimony by the private investigator and La Junta police officers "indirectly establishe[d] the identity and integrity of the evidence by tracing its continuous whereabouts" during the train ride from Albuquerque to La Junta. United States v. Zink, 612 F.2d 511, 514 (10th Cir.1980) (citation omitted). This uncontroverted testimony confirmed that the socks found on board the train and the socks introduced into evidence at trial indeed were one and the same. Moreover, the testimony established that the socks were "in substantially the same condition as when the crime was committed."[9] United States v. Gay, 774 F.2d 368, 374 (10th Cir.1985).
 
 
 21
 Because the trial court did not clearly abuse its discretion in allowing the socks into evidence, the government's failure to present testimony by the two Amtrak employees who handled the socks went "to the weight of the evidence and not to its admissibility." Wood, 695 F.2d at 462 (citations omitted). The jury concluded that the evidence was sufficiently reliable to support defendant's conviction despite testimonial gaps in the sock custody chain, a finding which we are not at liberty to set aside. "All reasonable inferences and credibility choices must be made in support of the jury's verdict." United States v. Alonso, 790 F.2d 1489, 1492 (10th Cir.1986) (citations omitted).
 
 
 22
 "Evidence is considered sufficient to support a criminal conviction if, when viewed in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Culpepper, 834 F.2d 879, 881 (10th Cir.1987) (citation omitted). Moreover, "the circumstantial evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities save guilt." Gay, 774 F.2d at 373.
 
 
 23
 The government was required to prove that defendant knowingly possessed cocaine with intent to distribute. 21 U.S.C. § 841(a)(1). The government established "constructive possession" through uncontroverted testimony that defendant was the only person who could have put the cocaine-filled socks in the lounge car restroom. See Culpepper, 834 F.2d at 881-82. The government also created a chain of custody sufficient to justify admission of the socks seized after defendant's arrest. Finally, the quantity and purity of the cocaine found in the socks supported the inference that it was intended for distribution, not personal use. See Gay, 774 F.2d at 372-73.
 
 
 24
 Viewing the record in the light most favorable to the government, we believe there was sufficient evidence to sustain the jury's finding of guilt beyond a reasonable doubt. We therefore AFFIRM defendant's conviction.
 
 
 
 *
 Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir. R. 36.3
 
 
 [1]
 See also Florida v. Royer, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on a street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.")
 
 
 [2]
 Our contrary holding in United States v. Ward, 961 F.2d 1526 (1992), is distinguishable in two important respects. First, the search and seizure in Ward occurred in "the smallest private compartment on the train." Id. at 1530. Second, Ward's "slight physique and health problems" made him "more easily intimidated than some other persons." Id. at 1533. In contrast, here the encounters occurred in public places, and defendant does not claim his personal traits make him more susceptible to coercion than the average person
 
 
 [3]
 Defendant's companion allegedly said he had just been released from an Illinois prison, he was a member of the Crips gang in Los Angeles and a related gang in Chicago, he was going to Chicago to see his parole officer, and he was able to identify the undercover agents before their approach. The companion also allegedly told defendant his name was different from the name printed on his train ticket
 
 
 [4]
 Rule 804(b)(3) allows admission of "[a] statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."
 
 
 [5]
 See Fed.R.Evid. 804, Notes of Committee on the Judiciary, S.Rep. No. 93-1277
 
 
 [6]
 Rule 804(b)(4) allows admission of "[a] statement concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history...."
 
 
 [7]
 Rule 804(b)(5) allows admission of
 [a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence....
 
 
 [8]
 The record indicates that the private investigator who discovered the first pair of socks found three more pairs of socks containing cocaine in the lounge car restroom after the train left Albuquerque. He gave the socks to the bartender, who transferred them to the train conductor. The conductor put the socks in a box for safekeeping and delivered the box to La Junta, Colorado, police officers when the train arrived there. The officers photographed, weighed, labelled and packaged the goods before sending them on another Amtrak train to Agent Small the next day. Agent Small received the socks on December 13, 1991, two days after they had been discovered
 
 
 [9]
 Defendant's contention that the socks could have been tampered with is unpersuasive because he failed to present any evidence of tampering or alteration. "Absent some showing by the defendant that the exhibits have been tampered with, it will not be presumed that the investigators who had custody of them would do so." Wood, 695 F.2d at 462