**UNITED STATES of America, Plaintiff,**

**v.**

**Moises MARTINEZ and Jesus Avila, Defendants.**

**Cr. A. No. 93–10073–01, 02.**

United States District Court, D. Kansas.

Jan. 19, 1994.

Lanny Welch, Asst. U.S. Atty., Wichita, KS, for plaintiff.

Ernest L. Tousley, Wichita, KS, for defendant Martinez.

Gail A. Jensen, Wichita, KS, for defendant Avila.

### ORDER

BELOT, District Judge.

Before the court are the following:

1. Defendant Moises Martinez' motion to suppress (Doc. 38);

2. Defendant Moises Martinez' amended motion to suppress (Doc. 52);

3. Government's response (Doc. 55);

4. Defendant Jesus Avila's motion to suppress (Doc. 48); and

5. Government's response (Doc. 54).

The court held hearings with respect to the motions on December 3 and 21, 1993 and January 3, 1994. Defendants are charged in a multi-count Indictment with various drug-related offenses. The motions before the court relate to Counts V, VI and VII of the Indictment which charge crimes occurring on or about August 11, 1993.[1] The search which is the subject of defendants' motions occurred in the early morning hours of August 12, 1993.

In the late afternoon of August 11, 1993, officers surveilling Martinez observed him on the second floor of an apartment complex in Wichita. They saw Martinez walk to approximately the center of the complex and then lost sight of him. The officers could not determine which apartment, if any, Martinez had entered. When Martinez left the apartment complex, the officers followed him. Later in the evening, Martinez was arrested on charges which are not relevant to the motions under consideration except to the extent that Martinez was in custody at the time the search giving rise to the motions took place.

Around or shortly after midnight on August 11/12, Detectives Stinson and Green returned to the apartment complex. Stinson was one of the officers who had surveilled Martinez on August 11. They engaged in surveillance for approximately thirty-five minutes and then went to see the apartment manager, a Mr. Jones. Jones told the detectives that Martinez paid the rent on Apartments 118 and 232 but did not live in either of them.[2] The detectives proceeded to Apartment 118 and knocked on the door. When no one answered, they went to Apartment 232.

Detective Green knocked on the apartment door and, presently, a woman later identified as Janice Anderson appeared at the window next to the door. Green and Stinson were wearing civilian clothes but Green "badged" Anderson and told her that they were police officers. No weapons were displayed. Green told Anderson that they wished to speak with her and Anderson opened the apartment door.

Green and Stinson entered the apartment, which was of the "studio" variety. Present in the living room area was a young boy who subsequently was identified as the son of Janice Anderson and Avila. Shortly after the detectives entered the apartment, Avila came out of bathroom.

There is some dispute regarding what happened after the detectives entered the apartment. Part of the confusion arises out of the facts that conversations were being carried on in both English and Spanish. Stinson and

---

**1.** Avila also is charged under 8 U.S.C. § 1326(b)(2).

**2.** The affidavit signed by Wichita police officer John Speer, which was attached to the Informa-

tion filed August 13, 1993 (Doc. 1) states that Martinez was the billing party for the utilities at Apartment 232 and that he had a key to the apartment.

Anderson speak only English. Green and Avila are bilingual.[3] Green apparently did most of the talking and when he spoke to Avila, they conversed in Spanish which neither Anderson or Stinson understood. With this background in mind, the following picture emerged from the testimony offered at the hearings.

The detectives told Anderson and Avila that they were looking for drugs and guns and inquired who was living in the apartment. Avila told Detective Green that he was paying rent to Martinez. Anderson told the detectives "we're just staying here," or words to that effect. Anderson testified that she had arrived in Wichita only two or three days before and that Avila told her only that the apartment belonged to a "friend." She denied knowing that the "friend" was Martinez until she learned it from one of the detectives. She first testified that she first met Martinez on August 11 when he came to the apartment sometime in the afternoon. Anderson later admitted, however, that she may have told the detectives that she had not seen Martinez on August 11. She also testified that she had not seen Avila on August 11 but that he was present in the apartment when she returned at approximately 1:00 a.m. on August 12.

Both Detectives Stinson and Green testified that they requested and received oral permission to search the apartment from both Anderson and Avila on as many as four occasions. They also stated that they presented written "consent to search" forms to Anderson and Avila but both declined to sign the forms. They did not tell either Anderson or Avila that they could refuse consent. They testified that although Anderson and Avila appeared to have been asleep when they first entered the apartment, both understood the detectives' request to search and both voluntarily consented.

Anderson's testimony was somewhat different.[4] She admitted that the detectives asked once for permission to search but she could not recall if either one of them said what they wanted to search for. Anderson stated that she refused the detectives' request and she testified that Avila did too, although she admitted that she does not speak Spanish. She recalled no conversations in Spanish. Anderson also admitted that she understood what was happening "for the most part" and that the search was not begun until after the detectives had asked for permission. She testified that she was asked if there were drugs in the apartment and she responded no, even though she knew there was marijuana in her purse. At the first hearing, Anderson stated that Green showed both she and Avila written forms which both she and Avila refused to sign. At a later hearing, Anderson testified that she could not recall if she was shown a form. She did testify, however, that she gave her permission to search her suitcase and her purse.

Detective Stinson proceeded to search the apartment and found a baggie containing white powder in a shoe. According to Stinson, Green asked who owned the shoe and both Anderson and her son replied that the shoe belonged to Avila. At this point, Avila was placed under arrest. When Detective Green found marijuana and cocaine in Anderson's purse, she was placed under arrest, too.

During the search, a small safe was located in a closet. Detective Green asked both Anderson and Avila about the safe. Detective Green testified that both Anderson and Avila denied any knowledge of the safe, even though it was in plain view. According to Detective Green, both Anderson and Avila told the officers that they could do whatever they wanted with the safe but Avila also told Detective Green "you know who the safe belongs to." Detective Green also admitted that Detective Stinson's written report reflects that Avila indicated that the safe "did belong to Mr. Martinez." (Defendants' exhibit 2).

---

**3.** There was no evidence that Avila was known to be bilingual at the time of the search. However, he appeared at the hearings without an interpreter and both he and his counsel assured the court that Avila speaks and understands English.

**4.** Avila did not testify at the hearings.

The detectives left the apartment with Anderson and Avila in custody. They also took custody of the safe. When they got to the police station, they opened the safe and found $7,800, a baggie containing approximately one pound of what was later determined to be marijuana. Also contained in the safe were various packages, the contents of which were later determined to be heroin and cocaine. The safe also contained papers addressed to Jesus A. Avila. Avila's fingerprints were found on a ziplock bag contained in the safe.

Detective Stinson and Green did not obtain a warrant prior to opening the safe. At the time they opened it, they knew or certainly had reason to believe that the safe belonged to Martinez and they also knew that Martinez was in custody. Notwithstanding this knowledge, they did not attempt to obtain Martinez' consent prior to opening the safe.

Both Martinez and Avila have moved to suppress all of the incriminating items found during the search. They contend that the detectives did not receive permission to search the apartment or the safe. The government responds that the detectives did receive permission to search the apartment, that Martinez lacks standing to challenge the search of the apartment as well as the contents of the safe and that Avila abandoned any right to object to the seizure and subsequent search of, the safe by telling the detectives either that he did know who owned the safe or that the safe belonged to Martinez.

### Standing

■ It is well established that a search violates a defendant's Fourth Amendment rights only if the defendant demonstrates that he or she had an actual, subjective expectation of privacy in the property searched and if the defendant establishes that society would recognize that subjective expectation as objectively reasonable. *United States v. Lyons,* 992 F.2d 1029, 1031 (10th Cir.1993). The court finds that Avila has demonstrated an objectively reasonable expectation of privacy in the contents of the apartment (but,

*see infra,* with respect to the contents of the safe) and the government does not contend otherwise. The court also finds that Martinez had an actual, subjective expectation of privacy in the apartment. The uncontroverted evidence shows that Martinez paid the rent on the apartment, had a key to the apartment and that the utilities were in his name. Both have the requisite standing to challenge the search of the apartment. In addition, because the court accepts as true the detectives' testimony that Avila identified Martinez as the owner of the safe and because there is no evidence that anyone else had access to the apartment to whom ownership of the safe may be attributed, Martinez also has standing to challenge the seizure and search of the safe and its contents. *See United States v. Davis,* 932 F.2d 752, 755 (9th Cir.1991).

### Consent

■ Both Martinez and Avila contend that the detectives did not obtain permission to search the apartment from either Anderson[5] or from Avila.

In *United States v. Soto,* 988 F.2d 1548, 1557 (10th Cir.1993), the court observed:

The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. (citation omitted.) When making this determination, a court should not presume that the consent was either voluntary or involuntary ... the government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific and that it was freely and intelligently given.

■ Based on the totality of the circumstances, the court finds that the government has met its burden to show consent to search the apartment. While the court admits having some pause over the fact that the detectives arrived at the apartment in the early hours of the morning and the absence of any compelling need to disturb the occupants of

---

**5.** Anderson could give effective consent to search because of her relationship to Avila and her joint access to the apartment. *See United States v.* *Nicanor–Almeida Iribe,* 11 F.3d 1553 (10th Cir. 1993).

the apartment at that time, this concern, standing alone, is not enough to invalidate the search. The uncontroverted evidence is that the detectives properly identified themselves and did not use force or coercion to gain entry into the apartment. Similarly, there is no evidence that once inside the apartment, the detectives threatened or coerced either Anderson or Avila. They did not initially suspect either Anderson or Avila of having committed any crimes and neither of them were immediately taken into custody. The fact the detectives did not tell either Anderson or Avila that they had a right *not* to consent to a search is not dispositive because they were not required to do so. *United States v. Manuel,* 992 F.2d 272, 275 (10th Cir.1993).

The detectives apparently believed that Avila did not speak English so Detective Green conversed with him in Spanish. In view of the later revelation that Avila is bilingual, there is no evidence to suggest that, nor is any claim made, that Avila somehow was prejudiced by his status as a non-US citizen.[6] Avila's failure to sign the written Consent to Search is, at best, ambivalent. While his refusal might be some evidence of lack of consent, it is also evidence that he understood he could refuse to sign a document presented to him by the detectives. The court finds that Avila consented to the search of the apartment.

The court likewise finds from the totality of the circumstances that Anderson's consent was voluntary. Although Anderson testified that she had been asleep when the detectives knocked, she also admitted that for the most part, she understood what was happening and that the detectives did not begin to search until they had asked for permission to do so. The truth of her testimony that she refused to consent to a search of the *apartment* is called into question by her admission that she authorized the detectives to search her *suitcase* and *purse*. Her credibility also is called into question by her admission that she told the detectives that there were no

drugs in the apartment when she knew that there was marijuana in her purse. Moreover, while she had every opportunity to do so, she did not testify that the detectives threatened her, or Avila or their child.

For all these reasons, the court finds that the detectives searched the apartment pursuant to consent voluntarily given by Anderson and Avila.

### Contents of the Safe

#### Martinez

■ Having determined that Martinez had a reasonable expectation of privacy in the safe and its contents, the court has no choice but to sustain Martinez' motion to suppress the search and seizure of the contents of the safe. The search of the safe cannot be considered contemporaneous to the lawful arrest of Avila and Anderson. The undisputed evidence is that the safe was not opened until sometime after Avila and Anderson were taken into custody. There is no evidence why the detectives considered it necessary to open the safe when they did, i.e. in the middle of the night or why they did not attempt to obtain Martinez' consent or, more importantly, a search warrant prior to opening the safe. The latter failure is especially difficult to understand since given all the facts and circumstances, there is every reason to believe that the detectives could have obtained a warrant. Since the safe was locked and securely in police custody, the detectives had no basis to believe that the contents, if any, of the safe would disappear.

Accordingly, Martinez' motion to suppress the search and seizure of the contents of the safe (Docs. 38 and 52) is sustained.

#### Avila

■ A different conclusion follows with respect to Avila's motion to suppress the search and seizure of the contents of the safe. The government contends it has shown that Avila abandoned the safe. Avila has not

---

**6.** In an affidavit attached to Martinez' brief in support of his motion to suppress (Doc. 39), an affidavit which was used to support the Information originally filed in this case (Doc. 1), it is averred that Avila was deported from the United States in 1981, 1982, 1987 and 1992. In addition, Avila is alleged to have been convicted in state court for possession with intent to sell cocaine.

addressed the issue of abandonment; rather, he simply has contended that because the safe was found in the apartment where he was arrested, and because he did not consent to the search of the apartment, and further because the safe was opened without a warrant, the seizure of the contents of the safe must be suppressed as to him.

Avila relies solely on *United States v. Donnes,* 947 F.2d 1430 (10th Cir.1991). *Donnes* clearly is inapplicable. The evidence in this case is essentially uncontroverted that Avila initially denied knowledge of the safe and, when it was shown to him, denied that it was his. The only dispute is whether Avila told the officers "you know who the safe belongs to," or words to that effect or whether he specifically told them that the safe belonged to Martinez.

In *United States v. Hernandez,* 7 F.3d 944 (10th Cir.1993), a border patrol agent was searching a bus when he noticed a backpack in an overhead storage compartment. The agent asked three persons sitting near the backpack if it belonged to them and they all denied that it did. Then, in a loud voice, he asked whether the backpack belonged to any of the passengers on the bus. Once again, he received no response. The agent picked up the backpack and again asked who owned it. Again, there was no response. The agent then took custody of the backpack and presented it to a drug dog, which alerted to its contents. Upon further inquiry, another passenger on the bus identified the defendant as the owner of the backpack but when the defendant was questioned, he denied ownership. The district court concluded that the defendant had abandoned the backpack and therefore did not have standing to challenge its search. It denied defendant's motion to suppress and on appeal, the Tenth Circuit affirmed.

The Tenth Circuit observed:

The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. *Id.;* [*U.S. v.*] *Jones,* 707 F.2d [1169] at 1172. This determination is made by objective standards. [*U.S. v.*] *Trimble,* 986 F.2d [394] at 399; *Jones,* 707 F.2d at 1172. An expectation of privacy is a question of intent which may be inferred from words, acts, and other objective facts. *Trimble,* 986 F.2d at 399; *Jones,* 707 F.2d at 1172. The abandonment must be voluntary. *United States v. Ward,* 961 F.2d 1526, 1535 (10th Cir.1992); *United States v. Morgan,* 936 F.2d 1561, 1570 (10th Cir.1991), *cert. denied* [—— U.S. ——] 112 S.Ct. 1190 [117 L.Ed.2d 431] (1992). For example, an abandonment is not voluntary when it results from a Fourth Amendment violation. *United States v. King,* 990 F.2d 1552, 1564 (10th Cir.1993); *Ward,* 961 F.2d at 1535. However, police pursuit or investigation at the time of abandonment of property, without more, does not of itself render abandonment involuntary. *Trimble,* 986 F.2d at 399; *Morgan,* 936 F.2d at 1570; *Jones,* 707 F.2d at 1172.

The facts clearly support the conclusion that Avila affirmatively disclaimed any interest in the safe. Under holding of *Hernandez,* his actions constituted abandonment. Therefore, Avila lacks standing to challenge the subsequent search of the safe and his motion to suppress (Doc. 48) is denied.

In summary, the court finds that both Martinez and Avila have standing to challenge the search of the apartment and the seizure of its contents. The court further finds that the search of the apartment was conducted with consent and therefore that the seizure of the contents of the apartment, including the safe, was proper. The subsequent forced entry into the safe, however, was improper and the seizure of its incriminating contents is suppressed as to Martinez. The seizure is not suppressed as to Avila because the court finds that he abandoned any claim of ownership of the safe or its contents before the safe was opened.

IT IS SO ORDERED.