UNITED STATES of America, Plaintiff,

v.

Frederick Aldon MAGEE and Mark Bradley Klinginsmith, Defendants.

Nos. 92–40062–01, 92–40062–02.

United States District Court, D. Kansas.

March 26, 1993.

Lee Thompson, U.S. Atty., Wichita, KS, Thomas G. Luedke, Asst. U.S. Atty., Topeka, KS, for U.S.

Marilyn M. Trubey, Asst. Federal Public Defender, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This matter is presently before the court upon several pretrial motions filed by the defendants. The court has conducted a hear-

ing on these motions and is now prepared to rule.

The defendants are charged with conspiracy to possess with the intent to distribute approximately 182 pounds of marijuana in violation of 21 U.S.C. § 846 and possession with the intent to distribute approximately 182 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Defendant Mark Bradley Klinginsmith has filed the following motions: (1) *Brady* motion for discovery of all favorable evidence of defendant's connection with searched items for defendant's motion to suppress (Doc. # 9); (2) motion to suppress (Doc. # 10); and (3) motion for discovery (Doc. # 11). Defendant Fred Aldon Magee has filed the following motions: (1) motion to suppress (Doc. # 12); (2) motion to join (Doc. # 13); and (3) motion for Rule 16 materials (Doc. # 14).

MOTIONS TO SUPPRESS

The defendants seek suppression of any statements or physical evidence that was obtained on November 12, 1992, the date of their arrest. The defendants contend that they were illegally seized on that date and that all evidence that was taken should be suppressed.

The court has heard considerable evidence on these motions and is now prepared to issue the following findings of fact and conclusions of law:

*Findings of Fact*

1. On November 12, 1992, at approximately 9:00 a.m., the Kansas Highway Patrol (KHP) began an operation on the northbound lanes of Interstate 35 (I–35) in Osage County, Kansas. Law enforcement officials in Kansas consider I–35, a four-lane highway, a major thoroughfare for drug couriers. The KHP placed a large sign next to the highway at a location just prior to Exit 160, an exit for Melvern, Kansas. The sign read: "NARCOTIC CHECK LANE AHEAD." The sign was a ruse since there was actually no checklane being maintained by the troopers. The sign was placed at this location for several reasons. The Melvern exit was selected because it is a "desolate area." The surrounding area is rural with the nearest town approximately five miles away. The exit is seldom used even by local traffic. There is no indication that any services are located at that exit. The nearest services on the highway are five miles south at Beto Junction, where U.S. Highway 75 crosses I–35. A sign on the exit indicates that Melvern is to the north and a frontage road is to the south. A traveler proceeding to the south will be driving on a gravel road. There are no signs indicating where the gravel road leads.

2. In planning the operation, a number of KHP troopers met on the morning of November 12. The plan called for a KHP aircraft to be in the air and to provide information on traffic violations to ground units, which consisted of both marked and unmarked cars. A number of ground units were in position to act upon any traffic violations or suspicious activity. The use of the aircraft was aborted shortly after the operation began because of weather problems.

3. At approximately 10:50 a.m., Troopers Kirk Simone and William Heady, who were driving separate cars, were advised that a blue vehicle with Nebraska license plates had left I–35 at the Melvern exit and was proceeding south on the gravel road at a rapid rate of speed. Both troopers began pursuing the car. Trooper Simone drove down the gravel road at speeds in excess of eighty miles per hour in an effort to make visual contact with the vehicle. After traveling three to three and one-half miles, Trooper Simone spotted the car. The car, a light blue Buick LeSabre, was just coming to a stop at a stop sign where the gravel road meets "old" highway 50. Trooper Simone observed the car turn left, travel a short distance, and then pull into a gas station. The car stopped near the diesel pumps. Trooper Simone followed the car to the gas station and parked several feet behind it. Trooper Simone was driving a dark blue unmarked car. As Trooper Simone parked, the driver of the other car immediately exited his vehicle and began walking towards Trooper Simone's car. The passenger remained in the car. Trooper Simone met the driver of the other car at the left rear of the Buick. Trooper Simone, who was wearing his KHP uniform, asked the driver if he could ask him some questions. The driver agreed to answer some questions. The driver told Trooper Simone that he had exited I–35 to search for

a gas station. This response appeared suspicious to Trooper Simone because the driver had just passed several large gas stations and truck stops at Beto Junction, and the twosome had traveled down a gravel road without any indication whatsoever as to what was at the end of the gravel road. The driver told Trooper Simone that he was traveling from Oklahoma City, Oklahoma to Lincoln, Nebraska. Trooper Simone noticed that he looked very nervous. Trooper Simone asked the driver if he would produce his driver's license and vehicle papers. The driver produced a driver's license indicating that his name was "Fred Aldon Magee." Magee indicated that the car had been rented by the passenger. This encounter with Magee was very brief, approximately thirty seconds in length.

4. By this time, Trooper Heady had arrived and parked behind Trooper Simone's car. Trooper Heady was driving a marked KHP vehicle. His car had a video camera mounted on the dashboard. He also had a wireless microphone which he used when operating the video camera. Prior to pulling into the gas station, Trooper Heady activated the video camera and the microphone. The events that occurred at the station in view of the camera were recorded. All conversations involving Trooper Heady or within earshot of his microphone were also recorded, except for three occasions, once when he turned off the microphone and warned Trooper Simone about the use of profanity, once when he accidentally turned off the sound, and once when the camera apparently malfunctioned. The videotape indicates that the camera was turned on at 10:56 a.m.

5. Trooper Simone proceeded to the passenger's side of the Buick and asked the passenger if he minded talking with him. The passenger indicated that he would not mind speaking with Trooper Simone. The passenger told him that they were coming from Mississippi and he did not know where they were going. The passenger produced a driver's license and the rental papers for the car. The driver's license identified the passenger as Mark Bradley Klinginsmith. Trooper Simone observed that Klinginsmith looked ill. Klinginsmith told Trooper Simone that he was sick with diarrhea.

6. Trooper Simone returned to speak with Trooper Heady. He told Trooper Heady that he believed the car had drugs in it, and he asked Trooper Heady to take over the matter. He provided Trooper Heady with the car rental papers. Trooper Andy Thomason arrived at approximately this time. He was left at the gas station by his partner, who left in their marked unit.

7. Magee told Trooper Heady that he and his passenger were coming from Oklahoma City, but that the trip had originated in Mississippi, where they had been building parking lots. Trooper Heady informed him that he was not in trouble, but that he wished to ask him some questions. Magee readily agreed to talk with Trooper Heady. They continued their conversation in Trooper Heady's patrol car because it was a cold, windy day. Trooper Heady discussed their trip and indicated that he was suspicious that they left I–35 and traveled down a gravel road to find a gas station when they had just passed one five miles back at Beto Junction. Trooper Heady noticed that Magee became extremely nervous during their conversation. He noticed that Magee failed to make eye contact with him and took some time in answering his questions. Trooper Heady asked Magee if he would mind if he ran a check on his driver's license. Magee indicated that he had no objection. Trooper Heady then sought an NCIC and Interstate Identification Index check by radio. Trooper Heady returned the driver's license to Magee at this time. Trooper Heady asked if he could review the car rental agreement, and Magee consented. Trooper Heady noticed a problem on the agreement concerning the due date of the car and brought this matter to Magee's attention. Magee indicated that Klinginsmith had rented the car. This conversation lasted approximately five minutes.

8. While Trooper Heady continued his conversation with Magee, Trooper Simone asked Magee if he wanted the car filled up with gas. Magee indicated that he did want the car filled up with gas. Klinginsmith moved the car to the gasoline pumps, exited the car, and proceeded into the gas station. Trooper Thomason and Trooper Simone followed him into the gas station. Trooper

Thomason was told by individuals in the gas station that Klinginsmith had gone into the bathroom. The two troopers approached the bathroom. Trooper Simone knocked on the door and asked Klinginsmith if he could conduct a pat down search of him and a general search of the bathroom. Klinginsmith opened the door and agreed to the searches. Trooper Simone frisked Klinginsmith and looked around the bathroom, which was very small. Trooper Simone found nothing, left the bathroom, and went back outside. Trooper Daniel Dick arrived at this time in his patrol car. Trooper Dick is a narcotic detection canine handler. He had with him his dog, "Chief."

9. Trooper Simone learned that the car took less than four dollars worth of gas. Trooper Simone then told Trooper Dick to move the defendants' car since it was blocking access to the gasoline pumps.

10. Trooper Heady then began conversing with Klinginsmith. At the outset, Trooper Heady told Klinginsmith that he was not under arrest and that Trooper Heady was not trying to unlawfully detain him. Trooper Heady explained that he was suspicious about their actions in leaving the highway and traveling on a gravel road in search of a gas station. Klinginsmith also appeared very nervous to Trooper Heady. He noticed a lack of eye contact and anxious pacing. Trooper Heady asked Klinginsmith if there were any firearms in the car. Klinginsmith responded, "No." Trooper Heady then asked if there were any drugs or large amounts of money in the car. Klinginsmith replied, "No. Do you wanna take a look?" Trooper Heady then asked if Klinginsmith had any objections to a search of the car. Klinginsmith said, "No. What did Fred say?" Trooper Heady told Klinginsmith that he would ask Magee about searching the car. This conversation lasted less than five minutes.

11. Trooper Heady approached Magee and asked him if they were carrying any guns, drugs, contraband or large amounts of money. Magee replied that they were not. Trooper Heady asked if he had any objection to a search of the car. Magee replied, "None whatsoever." Trooper Heady also asked if he had any problem with using the dog in the search of the car. Magee responded, "No."

12. Trooper Dick was then called in to use his dog to sniff the outside of the car. The dog alerted to the right rear fender of the car. He gave a passive alert, sitting down at that point. The positive alert occurred at approximately 11:12 a.m. Following the positive alert, the defendants were patted down and placed in handcuffs. The troopers then attempted to find the key to the trunk of the car. Magee and Klinginsmith were uncooperative in the troopers' efforts to find the key. The troopers pointedly asked for the key to the trunk and informed Magee and Klinginsmith that they would be responsible for any damage done to the car if the troopers were forced to physically open the trunk. The troopers also told them that "stalling is not going to help." Efforts were made to find the key and open the trunk, but they were unsuccessful. Eventually, Klinginsmith showed the troopers where the key to the trunk was hidden.

13. The trunk was opened and a number of packages of marijuana were discovered under a green tarp. Magee and Klinginsmith were placed under arrest at approximately 11:34 a.m. and given their *Miranda* warnings. A subsequent search also revealed some marijuana in some luggage found in the backseat of the car.

14. During this encounter, all of the KHP troopers were dressed in their complete uniforms. The troopers wore guns but did not unholster their weapons. Neither the flashing lights nor the sirens were ever activated on any of their vehicles. Their cars did not block the path of the defendants or the defendants' vehicle. The defendants were told prior to agreeing to the search of their car that they were not under arrest. The defendants were not commanded or directed to do anything. They consented to each request made by the troopers. Both defendants were cooperative and did not object to the troopers' actions.

15. Prior to defendants' car exiting, only one vehicle had left I–35 at the Melvern exit. This vehicle, a truck with Missouri license plates, stopped voluntarily in the roadway of the exit. Trooper Simone did talk with the driver and made no effort to detain him. There was no evidence presented that the

troopers intended to stop every car that left the highway at the Melvern exit or that they intended to stop only out-of-state vehicles.

*Conclusions of Law*

■ 1. There are three categories of police-citizen encounters: "(1) voluntary encounters, which are not seizures and do not implicate the Fourth Amendment; (2) investigative detentions, [often called *Terry* stops], which are seizures within the meaning of the Fourth Amendment and must be supported by reasonable suspicion; and (3) arrests, which are even more intrusive and must be supported by probable cause." *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992). Prior to the positive alert by the dog, the defendants were not "seized" within the meaning of the Fourth Amendment. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). In determining whether an individual has been seized, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at ——, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

■ 2. The defendants have vaguely suggested that they did not voluntarily stop at the gas station, but that they were stopped by Trooper Simone. In apparent support of this argument, they have noted three matters: (1) a reference in a report prepared by Trooper Dick to this incident as a traffic stop; (2) a statement in Trooper Simone's report that he "overtook" the defendants' car in his pursuit of them on the gravel road; and (3) Trooper Simone's "bad" reputation for truth and veracity in cases such as this one. The court finds that the evidence clearly demonstrates that the defendants voluntarily stopped their vehicle. The matters noted by the defendants fail to convince the court otherwise, particularly in light of all of the evidence presented. The references in the reports were adequately explained by the troopers who prepared the reports. The court found Trooper Simone's account of the events of November 12th credible. The videotape of the incident supported his testimony. The evidence demonstrated that the troopers did not in any way signal for the defendants to stop their car. They did not use their flashing lights or sirens. They made no effort to command or direct the defendants, and they did not block their path. Under such circumstances, the court concludes that the initial encounter between the troopers and the defendants was consensual since the defendants voluntarily stopped their vehicle. *See United States v. Langston*, 970 F.2d 692, 698–98 n. 3 (10th Cir.1992) (consensual encounter where driver voluntarily stopped car after police drove beside car and made eye contact with driver). Moreover, the events that occurred following the initial encounter also indicate a consensual encounter. The defendants' contention that they were seized after the initial questioning is not supported by the evidence. This encounter occurred in a public place where the defendants were within the view of persons other than law enforcement officers. This fact is "particularly significant" in considering whether an encounter was consensual. *United States v. Ward*, 961 F.2d at 1531. In addition, the defendants were told that they were not under arrest and that they had done nothing wrong. The defendants were cooperative and made no objections to the troopers' actions. Klinginsmith voluntarily consented to a pat-down search in the bathroom. Each defendant voluntarily consented to a search of the car. The defendants were closely watched by the troopers during the entire encounter at the gas station, but troopers did not restrict their travel or in any way direct it. Finally, we do not find that the troopers' failure to advise the defendants that they could refuse to answer questions or that they were free to leave suggests a seizure under all of the circumstances. Whether an individual is advised of his rights is important, but this factor by itself does not determine whether a seizure has occurred. *Id.*, at 1533. The defendants were specifically advised by Trooper Heady that they were not under arrest. He made no statements to them suggesting that they must remain at the gas station and answer his questions. In sum, under the totality of the circumstances,

we believe that a reasonable person would have felt free to leave and to refuse to talk to the troopers.

■ 3. Even if the questioning prior to the handcuffing of the defendants was considered an "investigative detention," and therefore a "seizure" for Fourth Amendment purposes, we believe reasonable, articulable suspicion supported the seizure. To justify an investigative detention of a person, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). In evaluating the validity of a *Terry* stop, the court must consider the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989). Here, the totality of the circumstances suggests that the investigative detention of the defendants was constitutionally justified. The following facts support this conclusion: (1) I–35 is a known avenue for transporting drugs; (2) the defendants had exited the highway at a seldom used exit immediately following the location of a narcotics checklane sign; (3) the defendants traveled down a gravel road that was not identified in any way; (4) defendant Magee indicated that they had exited the highway to find a gas station when he had just passed several gas stations at a well-marked exit; (5) the defendants appeared very nervous upon initial questioning; and (6) the defendants gave conflicting stories about the details of their trip. When a reasonable, articulable suspicion exists that a person is or is about to be engaged in criminal activity, investigative detention for questioning is constitutionally justified. *Ward*, 961 F.2d at 1529.

■ 4. The defendants were detained after the alert by the dog to the car. The troopers at that time had probable cause to detain the defendants, obtain a search warrant, or search the car pursuant to the "automobile exception." *See Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir.1989); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir.), *cert. denied*, 467 U.S. 1245, 104 S.Ct. 3523, 82 L.Ed.2d 830

(1984). The troopers then sought to gain access to the trunk either by obtaining the key to the trunk or by opening the trunk in some fashion. Ultimately, the troopers gained access by using the key that was produced by Klinginsmith after he demonstrated some reluctance to do so.

■ 5. The defendants have suggested that the circumstances show that they withdrew their consent to search the trunk of the car when they refused to produce the key. Even assuming that consent was withdrawn, we find that the search of the trunk was justified under the automobile exception to the search warrant requirement. The automobile exception justifies a police search of an automobile traveling on a highway, including all containers therein, upon probable cause to believe that it contains contraband. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *United States v. Arias*, 923 F.2d 1387, 1389–90 (9th Cir.1991); *United States v. Stone*, 866 F.2d at 364. Moreover, even if the automobile exception did not apply and consent to search had been withdrawn, the court would still be unable to conclude that the marijuana found in the trunk must be suppressed. The marijuana would have inevitably been discovered either through a search warrant or an inventory search. *See United States v. Andrade*, 784 F.2d 1431 (9th Cir.1986) (cocaine discovered one hour after defendant's arrest during search of garment would have inevitably been discovered through post-arrest inventory procedure).

■ 6. Following the positive alert by the dog, the defendants were placed in handcuffs. At this point, we find that the defendants were under arrest and should have been given their *Miranda* warnings. *See Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (*Miranda* warnings must be given when there is a "significant deprivation of freedom"). Any statement made by the defendants after that time in response to questions by the troopers prior to being told their *Miranda* rights must be suppressed. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682,

1689–90, 64 L.Ed.2d 297 (1980) ("[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."). The defendants were questioned by Trooper Heady about the location of the key to the trunk. We find that all statements made by the defendants following the time they were placed in handcuffs must be suppressed. This would preclude introduction of defendant Klinginsmith's conduct in showing the troopers where the key to the trunk was located. Again, we do not find that this ruling requires suppression of the marijuana because it would have inevitably been discovered.

7. The defendants have contended that the "Narcotics Check Lane" established by the KHP was unconstitutional. We find it unnecessary to reach this issue since the evidence has not demonstrated that a "Narcotics Check Lane" was ever established by the KHP or that the defendants were stopped as the result of a Narcotics Check Lane. In addition, there is no indication that the defendants were affected in any manner by the placement of this sign. The court heard no evidence that they exited the highway as a result of this sign. They have suggested that they exited in an effort to find a bathroom. Even were we to reach the question of the constitutionality of the sign, we find no support for the defendants' arguments.

## MOTION TO JOIN

Defendant Magee seeks to join in the motions of his co-defendant. To the extent applicable, this motion shall be granted.

## BRADY MOTION FOR DISCOVERY OF ALL FAVORABLE EVIDENCE OF DEFENDANT'S CONNECTION WITH SEARCHED ITEMS FOR DEFENDANT'S MOTION TO SUPPRESS

Defendant Klinginsmith seeks all exculpatory materials indicating that he owned, possessed or was connected with the car in which the marijuana was found or any of the items found in the car. The defendant contends that, although this evidence would seem to be detrimental, it is necessary for him to demonstrate standing for the purpose of challenging the search of the car.

The government has indicated that it has supplied all exculpatory materials to the defendants within its possession. Accordingly, this motion shall be denied as moot.

## MOTION FOR DISCOVERY

■ Defendant Klinginsmith seeks the following matters: (1) all reports made by Trooper Heady concerning drug seizures from January 1, 1991 to present; (2) all reports made by Trooper Simone concerning drug seizures from January 1, 1991 to present; (3) printouts of computerized dispatcher logs of stops made by Trooper Heady from January 1, 1991 to present; (4) printouts of computerized dispatcher logs of stops made by Trooper Simone from January 1, 1991 to present; (5) all manuals, tapes, films, etc. reflecting instructions or guidelines by the Kansas Highway Patrol to its troopers on stopping and/or searching a vehicle for the investigation of drug offenses; (6) all tapes made by the government of radio broadcasts made on November 12, 1991 in connection with the stop of the defendants' automobile; (7) all notes, logs, etc. touching on the stop of the defendants; (8) all complaints made against Trooper Heady; (9) all complaints made against Trooper Simone; (10) all records concerning the training, testing and performance of the drug dog involved in this case. Defendant contends that all of this information is necessary to present a full picture of pretextual conduct for the purpose of his motion to suppress.

The government objects to the defendant's requests. The government contends that the requests are either improper under the Federal Rules of Criminal Procedure, are overly broad, or lack a showing of relevance.

The court agrees with the position taken by the government. At this point, we do not find that the defendant has made a sufficient showing of relevance to justify production of these materials. Accordingly, this motion shall be denied.

## MOTION FOR RULE 16 MATERIAL

. Defendant Magee seeks all of the materials he is entitled to under Fed.R.Crim.P. 16. The government has indicated that it has complied with or will comply with Rule 16. It notes that it has provided the defendant

with all prior statements given by him and a copy of his criminal history. It further notes that it has no objection to allowing the defendant to inspect the evidence in this case. Finally, it states that all scientific reports will be provided when they are received. With this response, the defendant's motion shall be denied as moot.

**IT IS THEREFORE ORDERED** that defendant Klinginsmith's *Brady* motion for discovery (Doc. # 9) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Klinginsmith's motion to suppress (Doc. # 10) be hereby denied except as set forth in the above memorandum.

**IT IS FURTHER ORDERED** that defendant Klinginsmith's motion for discovery (Doc. # 11) be hereby denied.

**IT IS FURTHER ORDERED** that defendant Magee's motion to suppress (Doc. # 12) be hereby denied except as set forth in the above memorandum.

**IT IS FURTHER ORDERED** that defendant Magee's motion to join (Doc. # 13) be hereby granted.

**IT IS FURTHER ORDERED** that defendant Magee's motion for Rule 16 materials (Doc. # 14) be hereby denied.

**IT IS SO ORDERED.**