**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Pamela WHITE, Defendant.**

**No. 04–40018–01–JAR.**

United States District Court,
D. Kansas.

Oct. 6, 2004.

Gregory G. Hough, Office of United States Attorney, Topeka, KS, for Plaintiff.

## MEMORANDUM ORDER AND OPINION GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS

ROBINSON, District Judge.

This matter comes before the Court on defendant Pamela White's Motion to Suppress (Doc. 18). Defendant asks this Court to suppress all items seized during the search of her vehicle on September 16, 2003, and statements made by her during and subsequent to the search. The Court held a hearing on defendant's motion on September 30, 2004. After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule. For the reasons stated below, defendant's motion to suppress is granted in part and denied in part.

### Facts

On September 16, 2003, defendant was driving a black Dodge pickup truck on Interstate–70. At approximately 2:41 p.m., in Russell County, Kansas, Trooper Darrin Hirsh stopped the truck after he observed defendant follow a tractor trailer too closely, improperly pass the trailer, and cross completely over the white fog line. Hirsh walked up to the truck and identified himself; he was dressed in full Kansas Highway Patrol Uniform with a gun on his hip. He told defendant why he had stopped her and asked for her driver's

license and registration. Defendant provided Hirsh with a Georgia driver's license and the title to the truck, which listed Patricia Martin, not defendant as the owner. Defendant told Hirsh that the truck belonged to her daughter and that she was driving it back from her daughter's home in California to Georgia to see if she wanted to buy it.

Hirsh testified that in his first contact with defendant, he immediately noticed her extreme nervousness. He recounted that she was biting her lip so hard that her lip turned white and teeth marks were observable. Her hands were constantly fidgeting and shaking. Defendant was also sweating, although it was a warm day and she had her windows down. In addition, defendant would not make eye contact with Hirsh and kept looking away while he was talking to her. Hirsh also observed that defendant seemed to "think hard" and take a while to consider his questions before answering.

After visiting with defendant about her travel plans, Hirsh took her driver's license back to his car. He radioed dispatch to see if the license was valid and requested a Triple I because of his observations of extreme nervousness. Dispatch informed Hirsh that the license was valid and requested defendant's social security number to complete the Triple I check. Hirsh returned to defendant's vehicle, obtained her social security number and relayed the number to dispatch. Dispatch advised that defendant had a criminal history: 2 DUIs and a "5 D Green," which Hirsh explained meant a marijuana drug charge.

Hirsh wrote a warning ticket and took the ticket to defendant. He gave defendant the ticket, said "have a safe trip," and turned and started toward his car. Hirsh then turned around and asked defendant if she would mind answering a few questions.

After defendant indicated that she would answer questions, Hirsh asked her why she only had two small bags of luggage since she said she was traveling from California to Georgia. He also asked her if she had any drugs, contraband or large amounts of cash and she shook her head no.

In a nonthreatening pleasant tone, Hirsh asked defendant if he could "take a look." At first defendant replied "I don't know." He reiterated his request for consent to search to which defendant replied, "I don't care … Sure … I have nothing to hide." Hirsh then explained that if defendant did not consent, he could have the drug dog come and sniff around the vehicle, "It's your choice." Hirsh testified that he made no attempt to restrain, threaten or coerce defendant, nor did he make any promises to defendant. After defendant replied that she did not care if he searched, Hirsh asked her to exit the vehicle and stand near the guardrail at the front of her truck for his safety and hers.

Hirsh testified that he made the comment about the drug dog because he wanted defendant to understand what would happen if she did not consent to a search, and that he believed he had reasonable suspicion to detain the vehicle to wait for a drug dog. In addition to defendant's extreme nervousness which he had earlier observed, Hirsh based this suspicion on the following: (1) Interstate–70 was a known drug corridor; (2) defendant had a cell phone in the truck; (3) the Triple–I was positive for a drug charge; (4) defendant's travel plans were somewhat questionable; (4) defendant only had two small bags of luggage; (5) defendant was not listed on the truck's title; (6) the truck had been driven 180,000 miles, but was only five years old; (7) the truck's "check engine" light was on; and (8) the truck's windows were down on a very warm day.

After Hirsh asked defendant to exit the truck, he began to search it. He walked around the truck and searched inside the cab, but found nothing unusual. He then opened the hood and looked at the truck's engine. Under the truck's hood, Hirsh noticed that the vacuum hose on the intake manifold appeared to have been removed; he saw tool marks on the bolts that hold the intake manifold onto the engine and noticed that a clamp was in the wrong place. These observations seemed suspicious because Hirsh had recently seen another similar Dodge truck with an intake manifold modified to house a false compartment. Hirsh believed that either the truck had been recently repaired, or that it contained a false compartment. He asked defendant if she knew whether any mechanical work had been done on the truck and defendant replied "no." Defendant made no attempt to revoke her consent or limit its scope, even while Hirsh was examining the engine.

To further investigate, Hirsh removed the antenna from his patrol car and attempted to pass it through the intake manifold tube. He testified that normally the antenna would pass completely through the tube, which was about one foot long. In this case, however, the antenna could only be inserted about an inch. Hirsh stated that, at this point, he knew something was blocking the intake manifold, and believed a small false compartment probably with something of high value, such as coke or methamphetamine, was present in the truck. Hirsh called Deputy Schneider for assistance.

As Hirsh waited for Schneider, he told defendant that if there was something in the engine, she needed to "level with him." Defendant denied knowledge of a false compartment and contraband. By this time, defendant's nervousness had noticeably increased; Hirsh noted that defendant looked like she was about to cry and that her earlier nervous behavior was exaggerated. Defendant eventually admitted that she picked up the truck at a Days Inn hotel in Denver, Colorado and was hired to drive it from Denver to Georgia and that she had made up the story about her daughter. Following this admission, Hirsh handcuffed defendant, but stated that she was not under arrest and that he was simply cuffing her for his safety. He then walked her back to his patrol car and proceeded to ask her additional questions about making a controlled delivery before ultimately reading defendant her *Miranda* rights.

Hirsh testified that once he thought he found the false compartment, he considered defendant "in custody" and felt he had probable cause to arrest her. Kansas Highway Patrol requires that vehicles be impounded when the driver is arrested and there is no other person to drive the vehicle. Once the vehicle is impounded, officers are required to conduct an inventory search to identify the contents of a vehicle to protect the Kansas Highway Patrol from liability. In this instance, Hirsh testified that defendant's vehicle would have been impounded even if defendant failed to consent or retracted her consent, and that the drugs would have been discovered upon inventory.

After defendant was arrested, Schneider, a trained drug dog handler, arrived. Schneider had his drug dog, Jake, in his vehicle. Hirsh testified that Jake could have been used, but was never deployed. Hirsh and Schneider transported the truck to the Russell County Sheriff's Office and removed the air filter. In what should have been an open area underneath the air filter, they saw a metal plate. The officers removed the intake manifold and found a false compartment containing what was later determined to be methamphetamine.

Defendant subsequently gave a voluntary statement to DEA Task Force Officer Brad Carey,[1] in which she recounted that she was contacted by her brother-in-law to drive the truck from Denver, Colorado to Atlanta Georgia, that she was to be paid $2,000 for driving the truck, and other details of the transaction.

The grand jury returned a one Count Indictment on February 25, 2004, charging defendant with possession with the intent to distribute more than 500 grams of a substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

### Analysis

■ " 'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.' "[2] The principles of *Terry v. Ohio*[3] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[4]

### 1. Initial Stop

Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[5] Defendant was stopped for three traffic violations: following too closely in violation of K.S.A. § 8–1523(a), making an improper lane change in violation of K.S.A. § 8–1516(a), and failing to maintain a single lane of traffic in violation of K.S.A. § 8–1522. She does not contest the validity of the initial traffic stop.

### 2. Roadside Detention

■ Even if the initial stop of defendant's truck was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[6] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[7] The detention must be temporary and its scope must be carefully and narrowly tailored to its underlying justification.[8] "Under ordinary circumstances, this limits the officer to a request for the driver's license and registration, a computer

---

1. The parties have stipulated to the facts represented in the Government's response attributed to Carey. As such, the following facts are drawn from the Government's response.

2. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998) (further quotation omitted)).

3. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4. *Id.* at 19–20, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

5. *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir.2003) (quoting *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993)).

6. *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir.2001); *United States v. Bustillos–Munoz*, 235 F.3d 505, 512 (10th Cir. 2000).

7. *Cervine*, 347 F.3d at 870–71 (quoting *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999)).

8. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Lindsey*, 288 F.Supp.2d 1196, 1202 (D.Kan.2003).

check on the car and driver, an inquiry about the driver's travel plans, and the issuance of a citation."[9] Upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning.[10]

■ A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[11] If the officer continues to question the driver in the absence of either these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."[12] But, if an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[13]

### 3. Consensual encounter

■ Defendant contends that her Constitutional rights were violated when Hirsh continued to detain her without reasonable suspicion after the purpose of the initial stop had been accomplished. However, a longer detention is permissible if an officer has reasonable suspicion, *or* if the initial detention changes to a consensual encounter.[14] Here, the roadside detention was clearly consensual.

■ "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules."[15] Rather, the court must consider "the totality of the circumstances in a particular case."[16] While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, it "is not always sufficient to demonstrate that an encounter becomes consensual."[17] Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.' "[18] However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[19]

---

9. *Cervine*, 347 F.3d at 871.

10. *United States v. Zubia–Melendez*, 263 F.3d 1155, 1161 (10th Cir.2001); *Patten*, 183 F.3d at 1193.

11. *Cervine*, 347 F.3d at 871.

12. *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997) (internal quotations and citations omitted).

13. *See United States v. Walker*, 933 F.2d 812, 816–17 (10th Cir.1991) *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

14. *Cervine*, 347 F.3d at 871.

15. *Elliott*, 107 F.3d at 813.

16. *Id.* at 814 (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).

17. *Id.* at 814; *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir.1996).

18. *Elliott*, 107 F.3d at 814.

19. *United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir.1993); *see also United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997) (noting that an officer need not tell the driver he is free to leave for the encounter to be consensual).

In this instance, Hirsh returned defendant's license and the title to the truck and gave her a warning citation. He then said, "have a safe trip," and turned and started toward his car before turning back toward the defendant and asking her whether she would answer some questions. Hirsh posed this question in a pleasant tone and there was no coercive show of authority as he was alone, did not brandish his weapon, or otherwise indicate that compliance was required. Defendant agreed to answer questions and Hirsh proceeded to ask her about the lack of luggage for such a long trip. He also asked whether defendant was carrying drugs, weapons or large amounts of cash. In the context of a consensual encounter, merely asking questions does not constitute a seizure or implicate the Fourth Amendment.[20]

### 4. Voluntary Consent to Search

 Defendant argues that even if Hirsh's initial questioning was permissible, his attempt to gain consent transformed the encounter into a nonconsensual one and defendant was unlawfully seized. A search authorized by consent is wholly valid and a well-recognized exception to the prohibition against warrantless searches.[21] "Valid consent is consent which is freely and voluntarily given."[22] Voluntariness of consent is a question of fact to be determined from all the circumstances; a court should neither presume that the consent was voluntary or involuntary.[23] The government bears the burden of proving that consent was voluntary.[24] To satisfy this burden, the government must show that the consent was unequivocal and specific and freely and voluntarily given.[25] Mere submission to lawful authority does not equate to valid consent.[26]

The Court concludes that, under the totality of the circumstances, defendant's consent to search was voluntary. After defendant first responding equivocally to his request to search, Hirsh asked defendant again for consent to search explaining that it was okay if she did not want him to look. Defendant responded: "I don't care ... Sure ... I have nothing to hide." This statement provides unequivocal consent; that defendant did not respond "Yes" to the request does not render her consent invalid for no "magic words" are necessary.[27] Instead, the key focus is what a reasonable person would have understood by the exchange between the officer and suspect.[28] A reasonable person would have understood defendant's response as providing consent to search.[29]

**20.** *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Rivera,* 286 F.Supp.2d 1299, 1305 (D.Kan.2003)

**21.** *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**22.** *Patten,* 183 F.3d at 1194.

**23.** *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996).

**24.** *Patten,* 183 F.3d at 1194.

**25.** *United States v. Pena,* 143 F.3d 1363, 1366 (10th Cir.1998).

**26.** *United States v. Manuel,* 992 F.2d 272, 275 (10th Cir.1993).

**27.** *United States v. Stewart,* 93 F.3d 189, 192 (5th Cir.1996).

**28.** *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

**29.** *See e.g., United States v. Baker,* 78 F.3d 1241, 1244 (7th Cir.1996) (When driver stated in response to a request to search "I don't care—you can if you want to," any suggestion that his consent was ambiguous was meritless as his consent was clear and unequivocal); *Hall v. United States,* 418 F.2d 1230, 1231–32 (10th Cir.1969) (Defendant voluntarily consented to search of his luggage by making statement: "Sure, go ahead and search them, I don't have anything to hide"); *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir.

The mere fact that Hirsh repeated his request to search does not taint otherwise voluntary consent.[30] Moreover, there is no other evidence of coercion. Hirsh made the request to search in a non-threatening, pleasant tone; he did not unholster his weapon nor physically harass defendant. In addition, Hirsh was alone when he requested consent and the incident occurred on the shoulder of a busy interstate highway, in public view. Nor did he otherwise indicate that defendant had no choice but to consent. Indeed, in framing this request, Hirsh made clear that defendant was not required to provide consent. Thus, the government has met its burden and shown that defendant voluntarily consented to the vehicle search.

The Court does view as problematic Hirsh's statement made immediately after obtaining consent. He stated that if defendant did not consent, he could have the drug dog come and sniff around the truck, "It's your choice." He then asked defendant to exit the truck and stand near the guardrail so he could conduct the search. Confronted with a similar factual situation, the Fourth Circuit reasoned in *United States v. Lattimore* [31]:

> In view of the Government's concession that Frock did not possess the reasonable suspicion necessary to detain [defendant] to sniff his automobile, if [defendant] had not already given a voluntary oral consent to search, Frock's assertion that he would "call a drug dog" to search the automobile if [defendant] refused written consent would raise serious questions concerning the voluntariness of his consent ... But, it would be wholly inappropri-

ate for us to ignore the undisputed— and in light of his failure to withdraw consent, dispositive—fact that [defendant] gave a valid and voluntary oral consent to search.[32]

Thus, the court viewed the officer's statement concerning the drug dog as harmless in light of defendant's previous consent. Likewise, in this instance, Hirsh's statement was harmless as defendant had already freely and voluntarily consented to a search.

Yet another fact distinguishes this case from *Lattimore*. In *Lattimore*, the government admitted that no reasonable suspicion was present; whereas, here, Hirsh did possess reasonable suspicion to detain defendant's truck for a drug dog sniff. After stopping defendant, Hirsh made the following observations, which he referred to as "building blocks" in the reasonable suspicion calculus: defendant's hands were shaky and constantly fidgeting; she was biting her lip so hard that her lip turned white and teeth marks were observable; she was sweating; defendant avoided making eye contact with Hirsh; she seemed to "think hard" about Hirsh's questions and take a while to consider them before answering; these indicators of nervousness did not abate; she was traveling on Interstate-70, a known drug corridor; she had a cell phone, which can be indicative of drug activity; the Triple-I check was positive for a drug charge; her travel plans were somewhat questionable; she only had two small bags of luggage, but claimed that she was traveling from California to Georgia; she was not listed on the truck's title; the truck had been driven 180,000

---

2001) (Defendant's statement, "I've got nothing to hide" constituted voluntary consent to search").

**30.** *See United States v. LaGrone,* 43 F.3d 332, 334 (7th Cir.1994).

**31.** 87 F.3d 647 (4th Cir.1996).

**32.** *Id.* at 652.

miles, but was only five years old; the truck's "check engine" light was on; and the truck's windows were down on a very warm day, which can indicate that someone is trying to mask the scent of drugs.

Defendant attempts to discount each of these individual observations. But, the Supreme Court recently reiterated that reasonable suspicion rests on the "totality of the circumstances." [33] While under the defendant's analysis, any one of Hirsh's observations may be explained away, the Court concludes that these observations, taken together, gave him a "particularized and objective basis for suspecting legal wrongdoing." [34] He drew "on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." [35] Thus, the Court concludes that Hirsh's observations caused him to have a reasonable suspicion of criminal activity that would have justified a drug dog sniff.

Viewed in this context, Hirsh's statement about the drug dog is less harmful. In the context of a search warrant, "it is well-settled that the agent's statements to the effect that he would obtain a search warrant if the party did not consent to the search does not taint the party's consent to a search." [36] The Tenth Circuit has observed that "where some basis exists to support an application for a search warrant, an officer's expressed intention to seek a search warrant in the absence of consent does not render a consent involun-

tary." [37] Similarly, in this instance, Hirsh possessed reasonable suspicion which would have justified a drug dog sniff. In any event, the Court need not resolve whether Hirsh's statement about the drug dog rendered defendant's consent invalid for defendant freely and voluntarily consented to a search *before* Hirsh made this statement. Moreover, at no time did defendant withdraw her consent or limit its scope, even after Hirsh began to examine the truck's engine.

### 5. Inevitable discovery

■ Even in the absence of consent, the Court notes that defendant's motion to suppress might be denied under the inevitable discovery doctrine. Pursuant to the doctrine, "[e]vidence obtained illegally and subject to exclusion can be introduced at trial if the prosecution can show that, absent the illegality, an independent investigation inevitably would have led to discovery of the evidence through lawful means." In *United States v. Toledo,*[38] the Tenth Circuit held that "the drug-sniffing dog was an independent means of investigation that inevitably would have led to the lawful discovery of the marijuana." [39] The court specifically found that "given the way the marijuana was packaged in the trunk of the vehicle, a trained drug dog would have alerted to it." [40]

In this instance, Hirsh made clear that if defendant had not consented, he would have called a drug dog. It is undisputed

---

**33.** *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)

**34.** *See id.*

**35.** *See id.*

**36.** *United States v. Battle,* 117 F.Supp.2d 1175, 1179 (D.Kan.2000).

**37.** *United States v. Creech,* 221 F.3d 1353, 2000 WL 1014868 at *2 (10th Cir.2000) (un-

published opinion) (citing *United States v. White,* 979 F.2d 539, 542 (7th Cir.1992)).

**38.** 139 F.3d 913, 1998 WL 58117 (10th Cir. 1998) (unpublished opinion).

**39.** *Id.* at *4.

**40.** *Id.*

that Hirsh had a reasonable suspicion of criminal activity that would have justified a drug dog sniff. It is also undisputed that Jake, a trained drug dog, was on the scene. Hirsh merely chose not to deploy Jake because defendant consented to a search. The government, however, presented no evidence on the ability of Jake to detect the methamphetamine as it was secreted in the engine. Thus, the Court cannot specifically find that Jake would or would not have alerted to the drugs so as to implicate the inevitable discovery doctrine.

### 6. Statements Made Prior to *Miranda* Warnings

██ Lastly, defendant seeks to suppress statements she made prior to being *Mirandized*. She asserts that these statements were the fruits of an illegal search. Given the Court's holding that no illegal search occurred, these statements could not be the fruit of the poisonous tree.[41] Thus, this argument fails.

██ Additionally, plaintiff avers that suppression is warranted because certain statements were obtained in violation of Miranda. "[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"[42] A person is "in custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest.[43] The relevant inquiry for determining whether an individual is "in custody" is whether a reasonable person in that position would "believe her freedom of action had been curtailed to a 'degree associated with formal arrest.'"[44] A suspect can be placed in police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense.[45] Consequently, *Miranda* warnings might be implicated in certain highly intrusive "non-arrest" encounters.[46]

██ Generally, the questioning that occurs during a traffic stop requires no *Miranda* warnings [47] because such police-citizen encounters are brief, non-threatening, and conducted in the presence of others.[48] During a traffic stop, however, law enforcement officials may create the custodial interrogation that *Miranda* contemplates "by employing an amount of force that reache[s] the boundary line between a permissible *Terry* stop and an unconstitutional arrest."[49] The totality of the circumstances must be considered to determine whether the force employed during the traffic stop and prior to formal arrest created a "custody" situation under *Mi-*

---

**41.** *See, e.g., United States v. Maio,* 182 F.Supp.2d 1025, 1035 (D.Kan.2001).

**42.** *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993).

**43.** *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

**44.** *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993) (quoting *Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517 and *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

**45.** *Berkemer,* 468 U.S. at 441, 104 S.Ct. 3138.

**46.** *Perdue,* 8 F.3d at 1466.

**47.** *See Martinez,* 983 F.2d at 976 (citing *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138).

**48.** *See Berkemer,* 468 U.S. at 438–39, 104 S.Ct. 3138.

**49.** *United States v. Fields,* 2001 WL 1013308 (D.Kan.2001) (quoting *Perdue,* 8 F.3d at 1464).

*randa.*[50]

Following defendant's admission that she had been paid $2000 to drive the truck from Denver to Georgia, Hirsh handcuffed her, but stated that she was not under arrest and that he was simply cuffing her for his safety. He then walked her back to his patrol car and proceeded to ask her additional questions about making a controlled delivery before ultimately reading defendant her *Miranda* rights. At the point that defendant was placed in handcuffs, the Court finds that she was in custody and should have been given her *Miranda* warnings. Although Hirsh told defendant she was not under arrest, the Court concludes that given Hirsh's conduct immediately after explaining that defendant was not under arrest, a reasonable person would not have felt free to go at this time. Indeed, a reasonable person in defendant's position would have understood his freedom to be curtailed to a "degree associated with a formal arrest" at the point he was handcuffed and placed in the patrol car.[51]

■ In addition to concluding that defendant was "in custody," the Court must also find that defendant was subjected to "interrogation" before *Miranda* is applicable. Not all statements obtained by the police after a person has been taken into custody are the product of interrogation.[52] *Miranda* safeguards do come into play, however, when a person in custody is subjected to either express questioning or its functional equivalent.[53] Here, defendant was clearly subject to express questioning after she came into custody, but before being advised of her rights. Thus, any statements made by defendant in response to questions asked by Hirsh after she was handcuffed, but prior to being read her *Miranda* rights must be suppressed.[54]

■ The government suggests that suppression of the statements is not appropriate because, in light of defendant's subsequent statement to Carey, the statements were inevitably discovered. The doctrine of inevitable discovery, however, allows for the admission of evidence derived from a defendant's unconstitutional inculpatory statement, provided that the evidence would ultimately have been discovered by independent legal means.[55] It does not allow for the admission of the unconstitutional inculpatory statement itself.[56] Thus, the government's suggestion

---

**50.** *See United States v. Torres–Guevara*, 147 F.3d 1261, 1266 (10th Cir.1998).

**51.** *See, e.g., United States v. Magee*, 816 F.Supp. 1511, 1517–18 (D.Kan.1993) (defendants were "in custody" for purposes of Miranda when they were handcuffed).

**52.** *Rhode Island v. Innis*, 446 U.S. 291, 299, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**53.** *Id.* at 300–01, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297.

**54.** Even the government concedes that certain statements must be suppressed. The government admits: "Finally, it is clear that upon identifying the false compartment, the defendant was, at the very least, effectively under arrest. Any incriminating statements that the defendant made thereafter, but prior

to her being given her Miranda warnings would be subject to suppression." The government is, of course, incorrect in concluding that defendant was in custody or under arrest for *Miranda* purposes based upon Hirsh's testimony that he considered defendant under arrest when he thought he detected a false compartment. The subjective intent of both Hirsh and defendant are irrelevant. Rather, the "reasonable man" standard controls. *See Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.

**55.** *Nix v. Williams*, 467 U.S. 431, 447, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**56.** *United States v. Polanco*, 93 F.3d 555, 561 (9th Cir.1996) (citing *Nix*, at 437, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377); *United States v. Vasquez De Reyes*, 149 F.3d 192,

that defendant's statements made after being handcuffed, but before being *Mirandized* are admissible under the rubric of inevitable discovery is misplaced.

In contrast to defendant's statements, the inevitable discovery doctrine does apply to the methamphetamine. At the point defendant was handcuffed and in custody, she was effectively under arrest and Hirsh could have impounded the truck. Upon impoundment, Kansas Highway Patrol policy would have required Hirsh to conduct an inventory search on the truck and the drugs would have been inevitably discovered.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion to Suppress (Doc. 18) is GRANTED IN PART AND DENIED IN PART.

**IT IS SO ORDERED.**

195–96 (3d Cir.1998) (holding that inevitable discovery doctrine applies to physical evidence, not statements).